**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Laura Willms,                                    Civ. No. 12-2871 (JNE/JJK)

        Plaintiff,

v.
                                                 **REPORT AND**
Carolyn W. Colvin,                               **RECOMMENDATION**
Acting Commissioner of Social Security,

        Defendant.

---

Gregg B. Nelson, Esq., Social Security Disability Law Center, LLC; and Thomas A. Krause, Esq., Thomas A. Krause, P.C., counsel for Plaintiff.

Ana H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Laura Willms seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits.  The parties have filed cross-motions for summary judgment. (Doc. Nos. 11, 17.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion for summary judgment be denied and Defendant's motion for summary judgment be granted.

**BACKGROUND**

## I.  Procedural History

Plaintiff protectively filed an application for disability insurance benefits in March 2009, alleging a disability onset date of February 26, 2009.  (Tr. 10, 197–200, 254.)[1]  The Social Security Administration ("SSA") denied Plaintiff's claim initially and on reconsideration.  (Tr. 151–55, 159–61.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and the hearing was held on March 8, 2011.  (Tr. 162–63, 40–77.)  On March 22, 2011, the ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 7–29.)  Plaintiff sought review of the ALJ's decision, and the Appeals Council denied the request for review on September 13, 2012.  (Tr. 1–6.)  Denial by the Appeals Council made the ALJ's decision the final decision of the Commissioner.  *See* 20 C.F.R. § 404.981.  Plaintiff filed this action on November 14, 2012.  (Doc. No. 1, Compl.)  Thereafter, Defendant filed an Answer and certified copy of the administrative record.  (Doc. Nos. 7, 8.)  Pursuant to D. Minn. LR 7.2, the parties then filed cross-motions for summary judgment.  (Doc. Nos. 11, 17.)

## II.  Background

Plaintiff was born on January 12, 1964.  (Tr. 197.)  On February 26, 2009, her alleged onset of disability, she was 45 years old.  (Tr. 23.)  Plaintiff is a high school graduate, and she has completed a veterinary technician program.

---

[1]      Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 8).

(Tr. 251.)  Plaintiff previously worked in accounts payable, as an insurance service associate, a customer service specialist, and a veterinary technician. (Tr. 337.)  Plaintiff's last date of employment was June 1, 2006.  (Tr. 243.) Plaintiff alleges she is precluded from working due to mood swings, anxiety, panic attacks, difficulty relating to people and accepting criticism, depression, inability to concentrate, racing thoughts, loss of interest in activities, and suicidal ideation.  (*Id.*)  Plaintiff challenges only the ALJ's mental residual functional capacity ("RFC") determination.

### A.    Medical Records Before the Alleged Onset of Disability

On February 10, 2009, Plaintiff's psychiatrist, Dr. Bryan Cook at Human Services, Inc., completed a questionnaire from Plaintiff's attorney regarding Plaintiff's mental impairments and limitations.  (Tr. 346–50.)  The questionnaire contains a list of mental abilities needed to do skilled, semi-skilled, and unskilled work.  Dr. Cook checked boxes on the questionnaire to indicate that Plaintiff would be "unable to meet competitive standards" in certain mental abilities needed to do unskilled work – primarily working with others, dealing with work stress, and performing consistently without interruptions from psychologically based symptoms.[2]  (Tr. 348–49.) Dr. Cook also opined Plaintiff was "seriously limited but not precluded" from maintaining attention and attendance and working

---

[2]    Dr. Cook also rated Plaintiff's mental abilities to do semi-skilled and skilled work, but these ratings are not relevant because the ALJ found Plaintiff was capable of only unskilled work.

without special supervision.  (*Id.*)  Dr. Cook anticipated that Plaintiff would be absent from work more than four days per month due to her mental impairments. (Tr. 350.)  Dr. Cook's opinion was based on clinical findings of frustration intolerance and concentration difficulties secondary to anxiety and depression. (Tr. 347.)  He diagnosed Plaintiff with type 2 bipolar disorder and personality disorder not otherwise specified, and assessed Plaintiff with a GAF score of 55.[3] (Tr. 346.)

## B.    Medical Records After the Alleged Onset of Disability

In March 2009, Plaintiff reported to Dr. Cook that her finances were a source of her anxiety.  (Tr. 416–17.)  She reported her mood was up and down, but Dr. Cook noted that her thoughts and cognition were within normal limits. (Tr. 416.)  Dr. Cook summarized Plaintiff's condition as "some pessimistic mood instability."  (Tr. 417.)

Plaintiff saw her therapist, John Bennett[4] at Behavioral Health Services, Inc., on March 13, 2009.  (Tr. 388.)  At that time, Plaintiff reported she had been

---

[3]     The Global Assessment of Functioning Scale ("GAF"), a scale of 0 to 100, is used by clinician's to report an individual's overall level of functioning. *Diagnostic and Statistical Manual of Mental Disorders* 32 (American Psychiatric Assoc. 4th ed. text revision 2000) ("*DSM-IV-tr.*")  Scores from 41 to 50 indicate serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.* at 34.  Scores from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[4]     John Bennett, as designated by the initials "M.A. L.P.," is a licensed psychologist.  (Tr. 383.)  A licensed psychologist is an acceptable medical source under 20 C.F.R. § 404.1513(a)(2), whose opinion, as a treating source, is entitled

feeling anxious for several months, more so after being denied social security disability benefits.[5]  (*Id.*)  She asked Mr. Bennett to coordinate his work recommendations with Dr. Cook and her vocational counselor.  (*Id.*)  According to Mr. Bennett, Plaintiff's coping skills were quite limited, and Mr. Bennett believed Plaintiff should seek low stress, predictable, routine employment, dealing primarily with data because working with people caused Plaintiff to be anxious and irritable.  (*Id.*)  Further, Mr. Bennett's treatment records contain a section titled "Symptoms:  (1=mild; 2=moderate; 3=severe)."  (*Id.*)  There are twenty symptoms listed, and Mr. Bennett rated each one from zero to three.  On March 13, 2009, Plaintiff's symptoms of anxiety/panic and anger/hostility were moderate; her suicidal thoughts were mild; and presumably no other symptoms were present because they were rated "0".  (*Id.*)  Mr. Bennett diagnosed Plaintiff with anxiety disorder NOS, and moderate recurrent depression, with irritability under stress.  (*Id.*)

About a month later, Plaintiff told Mr. Bennett that she had some success with managing her daily routine and that Plaintiff's job coach expected her to make regular applications for work.  (Tr. 387.)  At that time, Mr. Bennett recommended that Plaintiff remain active and exercise to improve her mood and

to consideration for controlling weight.  *See Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (discussing Social Security Ruling 06-3p).

[5]     The denial of Plaintiff's prior claim for social security disability benefits, not under review here, was effective through February 27, 2009.  (Tr. 78–90.)  Her present application alleges disability beginning on February 26, 2009.  (Tr. 197–98.)

sleep. (*Id.*) He noted that her depression was moderate, and her anger/hostility and withdrawn/avoidant symptoms were mild. (*Id.*) In addition, he noted that her depression was improving due to her stable living arrangements. (*Id.*)

On May 15, 2009, Plaintiff reported to Mr. Bennett that she was struggling financially, waiting for an appeal of her claim for social security disability benefits and review of her workers' compensation coverage. (Tr. 386.) She told him that she spent twelve hours per week applying for jobs. (*Id.*) Mr. Bennett challenged Plaintiff to find the right job where she could work part-time with data "and not be frustrated or distracted by other workers." (*Id.*) Three days later, Plaintiff told Dr. Cook that she had mood swings, and slept either too much or too little. (Tr. 414.) Dr. Cook noted that her affect was bland, but her mental status examination was otherwise normal. (Tr. 414–15.) Dr. Cook summarized Plaintiff's condition as "some persistent sxs [symptoms]." (*Id.*)

According to her reports to Mr. Bennett, Plaintiff's mood improved somewhat in June 2009, but she was groggy from medication. (Tr. 385.) She stated that her habit of drifting off to sleep while watching television during the day prevented her from sleeping well at night. (*Id.*) Mr. Bennett recommended that she nap "in a more planful way." (*Id.*) Mr. Bennett also noted that Plaintiff's depression was moderate, and her anger/hostility, withdrawn/avoidant symptoms, and flashbacks were mild. (*Id.*)

On July 13, 2009, when meeting with Dr. Cook, Plaintiff denied significant depressive or anxiety symptoms. (Tr. 410.) At that time, her mental status

examination was normal, with the exception of fair to poor insight.  (*Id.*)  Dr. Cook noted that Plaintiff had a history of rapid cycling bipolar disorder, but her symptoms currently appeared to be well-controlled.  (*Id.*)  Dr. Cook recommended continuing her medications of Cymbalta, Abilify, Lamictal, and Neurontin.  (Tr. 411.)  He also stated that he believed Plaintiff could work twenty hours per week at a low stress job.  (*Id.*)

A few days later, Plaintiff told Mr. Bennett she had not expressed the depth of her despair to Dr. Cook.  (Tr. 384.)  She told Mr. Bennett that she had more bad days than good days since receiving a rejection letter regarding social security disability.  (*Id.*)  She stated that she would not harm herself but wished her life would end.  (*Id.*)  Mr. Bennett recommended that Plaintiff become more active with her family.  (*Id.*)  He noted that Plaintiff's depression remained moderate, and her anger/hostility, withdrawn/avoidant symptoms, and flashbacks were mild.  (*Id.*)

On August 28, 2009, Plaintiff reported to Mr. Bennett that she was doing fairly well "with occasional days of despair."  (Tr. 383.)  At that time, she was in the process of appealing a disability claim for carpal tunnel syndrome.  (*Id.*)  She stated that she felt good about planning a trip for her husband and enjoying time with her mother while he was gone.  (*Id.*)  She also stated she was happy to provide her mother with daily assistance.  (*Id.*)  She reported that she followed Mr. Bennett's advice and increased her activity by visiting her local animal shelter.  (*Id.*)

In October 2009, Plaintiff's stress was reportedly high because her social security disability appeal was stalled. (Tr. 703.) She told Mr. Bennett that on some weekends, she was bored, depressed, and hopeless. (*Id.*) Mr. Bennett noted, "[a]s always, the client has managed such mood with persistent activity: recently [s]he's been playing cards with her mother." (*Id.*) He noted that Plaintiff's depression remained moderate, and he recommended increased physical activity and socialization. (*Id.*)

Plaintiff saw Dr. Robert Most at Human Services, Inc., on November 16, 2009, complaining of increased depression, mood cycles, and anger. (Tr. 409.) On mental status examination, Dr. Most noted that Plaintiff's mood was depressed and irritable; her affect was mildly constricted with reduced interest and very low enjoyment; her prosody[6] was slightly blunted; and her orientation, grooming, eye contact, speech, cognition, associations, insight, and judgment were normal. (*Id.*) In addition, her concentration and attention were adequate to discuss her medications. (*Id.*) At that time, Dr. Most diagnosed Plaintiff with type 1 bipolar disorder. (*Id.*)

On November 20, 2009, Plaintiff reported to Mr. Bennett that she was disappointed with losing her social security appeal. (Tr. 702.) She told Mr. Bennett that she could not work because she became distracted and disorganized when stressed. (*Id.*) Mr. Bennett noted that he felt that Plaintiff

---

[6]     Prosody is the varying rhythm, stress, and frequency of speech that aids meaning. *Stedman's Medical Dictionary* 1459 (27th ed. 2000).

probably would be stressed in a work environment where she had to meet multiple, quick deadlines or deal with interpersonal communication because Plaintiff consistently reported getting irritated with other individuals under normal stress. (*Id.*) Mr. Bennett recommended that Plaintiff volunteer at a church or school because she enjoyed children. (*Id.*) Mr. Bennett noted that Plaintiff accepted this advice "far better than [his] disagreement with her about part-time work." (*Id.*) At that time, Mr. Bennett reported that Plaintiff's depression was moderate, and her anger/hostility, withdrawn/avoidant symptoms, and flashbacks were mild. (*Id.*)

On January 25, 2010, Plaintiff reported to Dr. Most that she was still depressed, but her chief complaint was irritability. (Tr. 408.) She noted that her sleep was adequate. (*Id.*) Dr. Most conducted a mental status examination, and noted that Plaintiff displayed a depressed and irritable mood, and that her associations were "a little ruminative," but he noted that she was otherwise normal. (*Id.*) The next month, Mr. Bennett noted that Plaintiff's recent hip surgery improved her mood, possibly because she was more mobile. (Tr. 699.) And he also noted that Plaintiff's neighbors had been supportive of her, and she looked forward to socializing with them. (*Id.*)

During an April 2010 session, Plaintiff told Mr. Bennett that she had improved with lithium, and they discussed creating a regular anger management routine to improve Plaintiff's relationships. (Tr. 698.) A few days later, due to Plaintiff's fatigue, Dr. Most lowered her dosage of Lamictal. (Tr. 405–06.) At that

time, Dr. Most noted that Plaintiff's mood was mildly depressed and less irritable, and her affect was notable for improved interest, occasional smiling, and less background distress. (*Id.*) Dr. Most diagnosed Plaintiff with type 1 bipolar disorder and borderline personality disorder.[7] (*Id.*) In July 2010, Plaintiff was reportedly more depressed because her sister's death was imminent. (Tr. 615.) At that time, Plaintiff had little energy and was sleeping excessively. (*Id.*) In addition, her mood and affect were depressed, her speech was slowed, she had passive suicidal ideation, and her thought process was ruminative. (*Id.*)

Plaintiff's primary concern in August 2010 was frustration with her husband. (Tr. 694.) Mr. Bennett encouraged Plaintiff to go out more, and noted that her depression was moderate, and her anger/hostility, withdrawn/avoidant symptoms, and flashbacks were mild. (*Id.*) Her mood improved with a medication change and resolution of marital issues in September 2010. (Tr. 693.) At that time, she reported that her sleep habits had improved with less napping during the day and that she had some increased interest in community education. (*Id.*) Mr. Bennett noted that Plaintiff's symptoms were all mild. (*Id.*)

In October 2010, Plaintiff's mild depression was somewhat improved, and her productivity increased. (Tr. 692.) Plaintiff's "highest stressor" was lack of social security disability review. (*Id.*) Plaintiff told Dr. Most she was having mood swings, meaning she would get angry about something and stay in a bad mood

---

[7] Borderline personality disorder is manifested by a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood. *DSM-IV-tr at* 706.

for hours.  (Tr. 617.)  This was usually associated with arguing with her husband over finances.  (*Id.*)  Dr. Most noted that Plaintiff was very mildly depressed.  (*Id.*)  When she saw Dr. Most on October 18, 2010, however, Plaintiff said she was more depressed, sleeping excessively, had very little energy, and virtually no enjoyment of activities.  (Tr. 616.)  On mental status examination, Dr. Most noted that Plaintiff was depressed; her speech was slow, and her thought process was ruminative; her orientation and appearance were normal; and that she denied suicidal ideation.  (*Id.*)  During this visit, Plaintiff said Cymbalta was helpful for her anxiety.  (*Id.*)

Plaintiff had a difficult month in November 2010, but the records reflect that Mr. Bennett congratulated Plaintiff on her emotional regulation during that difficult month, noting her excellent progress and that therapy had paid off over the years.  (Tr. 691.)  The next month, Plaintiff's mood was fairly positive despite serious financial problems.  (Tr. 690.)  Mr. Bennett noted that Plaintiff's depression was mild, without anger or hostility.  (*Id.*)  Mr. Bennett again encouraged her to develop a socialization plan.  (Tr. 914.)

Several months later, on March 3, 2011, Dr. Most noted that Plaintiff recently had hip replacement surgery.  (Tr. 826.)  He noted that on visit Plaintiff's mood was stable "except for the brief 'mood swings' or emotional lability that is more related to Borderline Personality Disorder than to Bipolar Disorder." (Tr. 826.)  He also noted that Plaintiff was "very mildly depressed" and her mental status examination was mostly normal.  (*Id.*)

The next day, Mr. Bennett and Dr. Most completed questionnaires from Plaintiff's attorney regarding Plaintiff's work-related mental limitations. (Tr. 809–21.) Mr. Bennett assessed Plaintiff with a GAF score of 50. (Tr. 809.) He opined that Plaintiff became fearful, unproductive, hopeless, and moderately disorganized under mild stress. (Tr. 810.) Mr. Bennett rated Plaintiff as "unable to meet competitive standards" in maintaining attendance and punctuality, working without special supervision, completing a workweek without interruptions from psychologically based symptoms, and performing consistently without unreasonable rest periods. (Tr. 811–12.) He opined that Plaintiff was "seriously limited but not precluded" from most of the remaining mental abilities required to do unskilled work. (*Id.*) He stated that Plaintiff's limitations were the result of her becoming anxious, impulsive, and irritable if demands on her were high or extended over time. (Tr. 813.) Mr. Bennett also opined that Plaintiff's impairments would cause her to be absent from work more than four days per month. (*Id.*)

Dr. Most completed the same questionnaire. (Tr. 816–21.) He assessed Plaintiff with a GAF score of 45. (Tr. 816.) He found Plaintiff to have a fair response to treatment, with moderation of her mood cycles. (*Id.*) Dr. Most rated Plaintiff as having "no useful ability to function" in maintaining attention for a two-hour segment, completing a workweek without interruptions from psychologically based symptoms, performing consistently without unreasonable rest periods, responding appropriately to changes in a routine work setting, and dealing with

normal work stress.  (Tr. 818–19.)  He rated Plaintiff as "unable to meet competitive standards" in remembering work-like procedures, carrying out very short and simple instructions, maintaining regular attendance and being punctual, working without special supervision, working in conjunction with or proximity to others, making simple work-related decisions, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers.  (*Id.*)  Dr. Most opined that Plaintiff's limitations were caused by her emotional instability, with impaired concentration and psychomotor slowing.  (Tr. 819.)  He anticipated that Plaintiff's impairments would cause her to be absent from work more than four days per month.  (Tr. 820.)

### C.    Medical Records After the ALJ's Decision[8]

Plaintiff was depressed in April 2011, after being denied SSDI benefits.[9] (Tr. 912.)  She reported to Mr. Bennett that she was sleeping quite a bit but also caring for her mother, cats, and husband.  (*Id.*)  At that time, Mr. Bennett wrote, "client agrees her depression is not severe, and is currently related to the denial." (*Id.*)  In therapy on May 13, 2011, the focus was on Plaintiff's SSDI appeal.

---

[8]    When the record contains supplemental evidence submitted subsequent to the ALJ's decision, and the evidence was considered by the Appeals Council, the "court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the decision was made." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (quoting *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). In practice, the court must "decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.*

[9]    The ALJ issued an unfavorable decision on Plaintiff's application on March 22, 2011.  (Tr. 7–29.)

(Tr. 911.)  Mr. Bennett continued to recommend half-time employment working with "data and things, in a calm setting."  (*Id.*)  He wrote that it was a "challenge to client to be active and focused, but not full time and exhausted."  (*Id.*)  Mr. Bennett noted that Plaintiff's depression was moderate, and her symptoms of anger/hostility, withdrawn/avoidant behavior, and flashbacks were mild.  (*Id.*)

In June 2011, Plaintiff was eating and sleeping adequately, but Mr. Bennett noted that she would benefit from more exercise and socialization.  (Tr. 910.)  Mr. Bennett also thought that having a job "would help."  (*Id.*)  He noted that Plaintiff had recently been walking, mowing the lawn, and caring for her mother and pets, and her symptoms were unchanged.  (*Id.*)  The following month, Plaintiff complained to Dr. Most of constant fatigue and low energy.  (Tr. 827.)  Dr. Most noted that Plaintiff's mood was mildly depressed, but her mental status was mostly normal.  (*Id.*)  Dr. Most recommended a lower dosage of Neurontin, which was being used to treat muscle tension.  (*Id.*)  Thereafter, Mr. Bennett noted that the medication adjustment was helpful.  (Tr. 909.)

In August 2011, Mr. Bennett noted that Plaintiff's depression was moderate after she had been busy with her husband's family reunion.  (Tr. 908.)  He also noted that Plaintiff's mood would moderate if she balanced social activity with getting rest and self-care.  (*Id.*)  The following month, Plaintiff's financial worries reportedly were mounting.  (Tr. 907.)  Nevertheless, Mr. Bennett noted that Plaintiff's depression, withdrawn/avoidant symptoms, and flashbacks were mild.

(*Id.*)  At that time, Mr. Bennett encouraged Plaintiff, "as always," to pursue a

hobby outside the home.  (*Id.*)

In October 2011, Mr. Bennett noted that Plaintiff's mood was mildly

depressed, but her sleep was adequate.  (Tr. 906.)  Mr. Bennett described

Plaintiff's success in therapy, after ten years of treatment, as modest but

longstanding.  (*Id.*)  In November, Plaintiff reported that she was worried about

her future living arrangements if something happened to her mother.  (Tr. 905.)

Mr. Bennett noted that Plaintiff stated she "did not feel she could work."  (*Id.*)  Her

mood, however, was "close to stable with support and meds."  (*Id.*)  Dr. Most also

saw Plaintiff at that time and described her mood as "euthymic with abundant joy

and normal interest."  (Tr. 829.)  Yet he assessed her with a GAF score of 50,

indicating serious symptoms.  (*Id.*)

In December 2011, Mr. Bennett noted that Plaintiff had "mild to moderate

symptoms of despair" but reduced anxiety given her stable living and financial

arrangements.  (Tr. 904.)  He also noted that Plaintiff's husband's disability

payments would soon be increasing.  (*Id.*)  The following month, however,

Plaintiff reportedly was depressed with passive thoughts of being better off dead.

(Tr. 903.)  She reported that she was under more stress because their household

was chaotic; her brother lost his house and moved in with them.  (*Id.*)  Plaintiff

reported that her sleep was adequate but interrupted, and she slept in a recliner

in the afternoons.  (*Id.*)  Mr. Bennett noted that Plaintiff's depression was

moderate, and her symptoms of anger/hostility, withdrawn/avoidant behavior, and flashbacks were mild.  (*Id.*)

In March 2012, during a visit with Mr. Bennett, Plaintiff's affect was moderately dull, consistent with her reported grogginess and dizziness from a new medication.  (Tr. 901.)  At that time, Mr. Bennett noted that Plaintiff was moderately depressed, and her mild anger was increasingly well managed.  (*Id.*)

### III.    Function Reports

Plaintiff and her husband completed reports for the SSA on May 20, 2009, about Plaintiff's functioning.  (Tr. 256–71.)  Plaintiff's husband, Richard Willms, Sr., wrote that Plaintiff spent her days watching television and napping. (Tr. 256.)  He also wrote that Plaintiff took care of her pets, did laundry, mowed the lawn, and went shopping once a week, and that she did not have any difficulty with personal cares.  (Tr. 257–59.)  In addition, Mr. Willms wrote that Plaintiff did not get along well with others, she needed reminders to take her medication, and she had difficulty handling stress.  (Tr. 260, 262.)  He also noted that throughout the day she went through mood changes, sometimes seeming alright, then appearing depressed.  (*Id.*)  Plaintiff's function report was consistent with her husband's, but also indicated that her concentration was worse than it used to be.  (Tr. 268.)  In addition, Plaintiff noted that dealing with bosses caused her to have panic attacks, and she did not handle stress well.  (Tr. 270.)

Plaintiff's mother, Mary Pawlenty, completed a function report regarding Plaintiff on October 18, 2009.  (Tr. 291–98.)  She reported that Plaintiff spent her

days caring for her cats, doing laundry, cleaning, visiting with her mother, and going places with her husband.  (Tr. 291.)  She noted that Plaintiff did not cook but only because she did not like cooking.  (Tr. 293.)  Ms. Pawlenty also wrote that Plaintiff took care of her flower beds every other day, and Plaintiff shopped and could handle money.  (Tr. 293–94.)  In addition, Plaintiff's hobbies were reading, watching television, playing cards, and playing games on the computer.  (Tr. 295.)  Ms. Pawlenty reported that Plaintiff's medications affected her concentration, and that sometimes she handled stress very well, and other times very poorly.  (Tr. 296–97.)  She also stated Plaintiff was able to handle changes in routine adequately, but she assumed others were talking and laughing about her.  (Tr. 297–98.)

Plaintiff completed another function report on October 16, 2009.  (Tr. 283–90.)  At that time, she noted that she needed reminders for grooming and taking her medications, and that she had increased difficulty with concentration.  (Tr. 285, 287.)  She stated that she did not get along with others because she had bad moods.  (Tr. 288.)  And she stated that she had been laid off from a job at an insurance company because she could not get along with others.  (Tr. 289.)

## IV.    Testimony at the Administrative Hearing

### Plaintiff's Testimony

Plaintiff testified as follows at the Administrative Hearing.  She stated that the main reason she could not work since February 2009 was her bipolar disorder.  (Tr. 46.)  She stated she had anxiety attacks once or twice a week,

lasting two to five minutes, which were brought on by many different things. (Tr. 49.)  She had trouble dealing with people, the public, and with criticism. (Tr. 46.)  She had to isolate herself due to mood cycles, and she had difficulty with attention and concentration, including that she could not concentrate while playing games or watching television.  (Tr. 47–48.)  In addition, she stated that she would forget to take her medication once or twice a week.  (Tr. 48.)

Plaintiff testified that she is married and lives with her husband and mother.  (Tr. 53–54.)  She said that her husband did all of the cooking, and she needed reminders or she would forget to eat.  (Tr. 56–57.)  She would take her mother to the grocery store once a week.  (Tr. 57.)  And she did her own laundry, if someone reminded her.  (*Id.*)  She also stated that her husband did the cleaning, despite his bad back, because she did not care if things got done or not, and she could not concentrate.  (Tr. 58–60.)

Plaintiff testified that during the day she played Scrabble or watched television, but had no interest in anything.  (Tr. 58.)  She said she did not do anything with other people.  (Tr. 58–59.)  And if she was really depressed, she went to an animal shelter to visit the cats.  (Tr. 61.)  She stated she had crying spells every few days, lasting up to an hour, for no apparent reason.  (Tr. 61–62.)  In addition, Plaintiff testified that she had angry outbursts, often over a minor incident, causing her to lash out at people.  (Tr. 63.)  She stated that she did not have friends or interests.  (*Id.*)  She got along with her husband and mother when she was not having a mood swing.  (Tr. 65.)  Plaintiff stated that her last

employment at an insurance agency ended because she could not get along with coworkers or accept criticism from her supervisor, and she was paranoid, had anxiety attacks, and could not focus. (Tr. 66.) According to Plaintiff, these problems did not go away after she quit working. (*Id.*) She stated that her medication made her sleepy, causing her to take naps during the day, and stated that her medications were recently increased. (Tr. 67.)

## Vocational Expert's Testimony

A vocational expert, Kenneth Ogren, also testified at the administrative hearing. The ALJ asked Mr. Ogren what type of work the following hypothetical person could perform. (Tr. 70.) The person was 47 years old, with a high school education and the work history described in the testimony and the vocational expert's report. (*Id.*) The person had impairments of osteoarthritis of the hips, hip replacements, obesity, sleep apnea, asthma, degenerative joint disease of the knees, sensorineural hearing loss, history of bilateral carpal tunnel releases, bipolar disorder, and borderline personality disorder. (*Id.*) The person would be limited to sedentary work, lifting ten pounds occasionally, sitting six hours, and walking or standing two hours per workday. (*Id.*) The person was additionally restricted to occasional power gripping; occasional use of vibrating tools; no exposure to high concentrations of air pollutants or high levels of heat or humidity; routine, repetitive, unskilled, low stress work with no more than routine changes; no public contact; and brief and superficial contact with coworkers and

supervisors.  (Tr. 70–71.)  Finally, the work should involve "things rather than people."  (Tr. 71.)

Mr. Ogren testified that such a person could not perform any of Plaintiff's past relevant work, but the individual would be able to perform the following jobs, defined in the Dictionary of Occupational Titles ("DOT"):  cuff folder,[10] polisher,[11] and inspector.[12]  (*Id.*)  In response to questioning by Plaintiff's counsel, Mr. Ogren also testified that a person with the limitations described in the questionnaires completed by Dr. Cook, Dr. Most, and Mr. Bennett would be unemployable.  (Tr. 74–75.)

## V.     The ALJ's Findings and Decision

On March 22, 2011, the ALJ issued a decision concluding that Plaintiff was not under a disability as defined by the Social Security Act from February 26, 2009, through the date of the decision, therefore denying Plaintiff's application for disability insurance benefits.  (Tr. 10–24.)  The ALJ followed the five-step evaluation set out in the Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The Eighth Circuit Court of Appeals has summarized the five-step evaluation process as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical

---

[10]     DOT Code 685.687-014, with 2,200 jobs in Minnesota.

[11]     DOT Code 713.684-038, with 2,300 jobs in Minnesota.

[12]     DOT Code 669.687-014, with 2,100 jobs in Minnesota.

or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience)"; (4) "whether the claimant has the residual functional capacity ["RFC"] to perform his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work then the burden is on the Commissioner "to prove that there are other jobs in the national economy that the claimant can perform." *Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998) (citation omitted).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 26, 2009. (Tr. 12.) At step two, the ALJ found that Plaintiff had the following severe impairments: "history of bilateral hip replacement due to end stage osteoarthritis, obesity, sleep apnea, asthma, degenerative joint disease of the knees, status post bilateral carpal tunnel releases, bipolar disorder versus major depression, anxiety not otherwise specified, and borderline personality disorder[.]" (*Id.*) And at step three, the ALJ determined that Plaintiff's physical and mental impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13).

At step four, the ALJ found that Plaintiff had the RFC to perform:

sedentary work as defined in 20 CFR 404.1567(a) with the following specific limitations: the claimant is capable of lifting up to 10 pounds occasionally and standing up to 6 hours in an 8-hour workday,

standing/walking up to 2 hours in an 8-hour workday; she is limited to no more than occasional power gripping or use of vibrating tools; she is limited to work involving no exposure to high concentrations of air pollutants or high levels of heat and humidity; she is further restricted to routine, repetitive, unskilled work that does not involve public contact or more than brief and superficial contacts with coworkers and supervisors; she is limited to low stress work (defined as no more than routine changes in the work process or work setting); the work should involve working with things rather than people.

(Tr. 16.)  In reaching this RFC determination, the ALJ began by reviewing Plaintiff's application and testimony, primarily that she could not work due to mood swings and very poor concentration and memory.  (Tr. 17–18.)  Based on Plaintiff's mental health treatment during the applicable time period, the ALJ found Plaintiff to have only moderate difficulties maintaining concentration, persistence, or pace, and in maintaining social functioning.  (Tr. 19.)  The ALJ noted that Plaintiff's mental status examinations by Dr. Most were "generally quite unremarkable."  (*Id.*)  And Plaintiff's therapist, Mr. Bennett, noted improvement in Plaintiff's symptoms over the course of therapy.  (*Id.*)  The ALJ found that the medical records reflected Plaintiff was higher functioning than she testified to at the hearing and the records further demonstrated her unwillingness to follow treatment recommendations to be more active and participate in more social activities.  (Tr. 20.)

The ALJ also stated that Plaintiff's testimony about her activities was also inconsistent with the record.  (*Id.*)  The ALJ noted that Plaintiff testified that her disabled husband did all of the work around the house, but the records showed

Plaintiff did housework, assisted her mother daily, shopped weekly, gardened, and visited the local animal shelter regularly.  (*Id.*)  The ALJ also noted that when Plaintiff had a financial interest in workers' compensation, she was able to spend twelve hours per week applying for jobs.  (Tr. 21.)  In addition, the ALJ noted that Plaintiff worked in full-time competitive employment for a number of years, but did not continue to look for work within her limitations.  (*Id.*)

The ALJ gave some probative weight to the state agency psychological consultants' opinions because they were consistent with the weight of the evidence.  (*Id.*)  The ALJ gave no probative weight to Mr. Bennett's opinion because it was inconsistent with his treatment notes.  (*Id.*)  Specifically, the ALJ explained that Plaintiff's mental status examinations were unremarkable, her symptoms improved, and none of her mental health symptoms were more than moderate at any time.  (Tr. 21–22.)  The ALJ found Dr. Most's opinion was also inconsistent with his own treatment notes, and she gave it no probative weight. (Tr. 22.)  In addition, the ALJ considered Dr. Cook's opinion and gave it no weight because it was inconsistent with Dr. Cook's treatment notes, Plaintiff's mental status examination findings, and the fact that Dr. Cook assessed Plaintiff with a GAF score of 55.  (*Id.*)  The ALJ also noted that Dr. Cook, Dr. Most, and Mr. Bennett were not aware of how Plaintiff presented outside of mental health treatment.  (*Id.*)  The ALJ explained that Plaintiff's physical therapy notes and

preoperative examination notes did not reflect any anxiety or difficulty with social functioning. (*Id.*)[13]

Ultimately, at step four of the disability determination procedure, the ALJ found that Plaintiff was not capable of performing her past relevant work. (*Id.*) But at step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cuff folder, polisher, and inspector. (Tr. 23–24.) Thus, the ALJ concluded that Plaintiff was not under a disability from February 26, 2009, through the date of the ALJ's decision. (Tr. 24.)

## DISCUSSION

### I.     Standard of Review

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation

---

[13]     The ALJ cited Exhibits 19F and 22F, which correspond to pages 654–687 and pages 769–806 in the Administrative Record.

omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Id.* In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928

F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II. Analysis of the ALJ's Decision

Plaintiff alleges two errors by the ALJ. (Doc. No. 12, Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.").) First, she argues the ALJ failed to properly evaluate her treating psychiatrists' and therapist's opinions, which should have been given the greatest weight.[14] (Pl.'s Mem. 12–21.) Second, she asserts the ALJ failed to fully and fairly develop the medical record by failing to obtain work-related mental limitations from an examining source, instead improperly relying on the opinion of a non-examining source. (Pl.'s Mem. 23–26.)

Defendant, on the other hand, asserts the ALJ considered all of the relevant evidence and properly concluded Plaintiff was able to work. (Doc. No. 17, Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 1.) Defendant argues the ALJ appropriately weighed the opinion evidence and discounted Dr. Cook's, Dr. Most's, and Mr. Bennett's opinions. (Def.'s Mem. 7–16.)

---

[14]    Plaintiff also asserts the ALJ erred by relying extensively on GAF scores to the exclusion of the remainder of the medical records. (Pl.'s Mem. 21–23.) This is incorrect. The ALJ only mentioned a GAF score once, noting Dr. Cook assigned a GAF score of 55 on February 10, 2009. (Tr. 22.)

Defendant also contends that the record was fully developed, and did not require further development simply because the ALJ rejected the treating providers' opinions. (Def.'s Mem. 17–21.)

### A. Evaluation of the Opinion Evidence

A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and not inconsistent with other substantial evidence in the record. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir. 2000)). Treating physicians' opinions are given less weight "if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Plaintiff contends the ALJ erred by discounting Dr. Most's, Dr. Cook's, and Mr. Bennett's opinions. (Pl.'s Mem. 14–21.) She asserts the ALJ conflated her ability to work part-time with the ability to work full-time on a sustained basis. (Pl.'s Mem. 16–17.) Each of her treating sources believed she would miss work two or more days per month due to her mental impairments. (*Id.*) Plaintiff also argues the ALJ unreasonably rejected Mr. Bennett's opinion because he was not aware of how Plaintiff presented outside of the setting of mental health treatment. (Pl.'s Mem. 20.) And Plaintiff argues that the treating source opinions, when read in the context of her structured lifestyle, are consistent with the treatment records. (Doc. No. 20, Pl.'s Resp. Opposing the Commissioner's Mot. for Summ.

J. ("Pl.'s Resp.") 5–6.)  In other words, she argues that she only functioned as well as she did because she stayed home most of the time and was not experiencing work stress.  (*Id.*)  Plaintiff argues that the ALJ selectively read the record, and that the narratives in her treatment records support disability.  (*Id.*)

In their responses to the questionnaire in the record, Dr. Cook, Dr. Most, and Mr. Bennett agreed that Plaintiff could not work with others, could not maintain persistence or pace, could not handle normal work stress, and was limited to part-time work.  (Tr. 346–50, 809–21.)  Mr. Bennett further opined that Plaintiff could not maintain regular attendance, work without special supervision, or complete a normal workweek without interruptions from psychologically based symptoms.  (Tr. 811–12.)  Dr. Most added that Plaintiff would not be able to remember work-like procedures, carry out very short and simple instructions, or make simple work-related decisions.  (Tr. 818–19.)  He also assessed Plaintiff with a GAF score of 45 on March 4, 2011, indicating serious mental health symptoms.  (Tr. 816.)

Although the evidence supports a limitation in Plaintiff's ability to work with others—due to her inability to accept criticism, her fears that others were talking about her, and her angry mood cycles—the evidence does not support limitations that would preclude low stress work that does not involve public contact or more than brief and superficial contacts with coworkers and supervisors, and work involving "things" rather than people, as found by the ALJ.  (*See* Tr. 16–17.)  Plaintiff's last ten years of employment involved significant contact with other

people, including customer service in her last job.  (Tr. 337.)  Plaintiff was let go from her last job because she could not get along with others.  (Tr. 289.)  The record is clear that Plaintiff could not handle such a stressful environment, and would do better, as Mr. Bennett noted, working with things rather than people.  (Tr. 911.)  The ALJ, however, incorporated these limitations into her RFC finding.  (Tr. 16.)

The issue, therefore, is whether Plaintiff is unable to handle even superficial contact with coworkers and supervisors and low stress work.  The record as a whole suggests that she can.  For example, in March 2009, Dr. Cook's summary of Plaintiff's condition was "some pessimistic mood instability."  (Tr. 417.)  According to Mr. Bennett's treatment records, Plaintiff's symptoms included anger and hostility but Bennett rated these symptoms, all but once, as mild.  (Tr. 382–393, 690–704, 901–914.)  Plaintiff also had symptoms of avoidance, withdrawal, and isolation from others, but these symptoms were never more than mild.  (*Id.*)  And when Plaintiff's neighbors were supportive of her after she had hip surgery, she looked forward to socializing with them, suggesting she did not seek complete isolation from others.  (Tr. 699.)

Regarding work stress, Plaintiff told Mr. Bennett that she became distracted and disorganized when stressed.  (Tr. 702.)  Mr. Bennett opined that Plaintiff probably became stressed when she had to meet multiple, quick deadlines or deal with interpersonal communication.  (*Id.*)  Plaintiff also consistently reported getting irritated with other individuals under normal stress.

(*Id.*)  The ALJ, however, accommodated all of these limitations by restricting Plaintiff to unskilled low stress work and only brief, superficial contact with others. (Tr. 16.)

Furthermore, the record indicates that Plaintiff could function under a normal amount of stress.  Plaintiff was often under a great deal of financial stress after she stopped working, waiting years for decisions on her workers compensation and social security disability claims.  (Tr. 383, 416, 386, 690, 907.) Yet, over these years, Plaintiff's depression was moderate, and her other symptoms were mild.  (Tr. 382–393, 690–704, 901–914.)  She was able to provide daily care to her elderly mother and help maintain the household with her disabled husband, even though they often argued about finances.  (Tr. 291, 910, 912, 383.)  In addition, in June 2011, Mr. Bennett noted that having a job would probably be a good thing for Plaintiff.  (Tr. 910.)  Thus, the record as a whole is consistent with the ALJ's conclusion that Plaintiff is able to deal with low stress work, when there is only brief and superficial contact with coworkers and supervisors.

Additionally, there is little support in the record for a part-time work restriction.  Mr. Bennett's continued recommendations that Plaintiff be more active are inconsistent with his recommendation for part-time work.  (Tr. 387, 384, 702, 703, 910.)   And Mr. Bennett's suggestions that Plaintiff would sleep better at night if she did not nap during the day indicate that her daytime fatigue could be resolved and could allow for full-time employment.  (Tr. 693, 390, 385.)

Further, Dr. Cook stated that his opinion of Plaintiff's work limitations was supported by clinical findings of frustration intolerance and concentration difficulties secondary to anxiety and depression. (Tr. 347.) The treatment records contain very little discussion of anxiety. Plaintiff's treating providers had not noted any anxiety since March 2009, and Plaintiff denied significant anxiety symptoms in July 2009. (Tr. 388, 410.) Plaintiff did not report any panic attacks to her psychiatrists or psychologist after her alleged onset date. Moreover, none of Plaintiff's treating providers found her to have limited concentration during any evaluation.

The inability to maintain regular attendance and punctuality and the inability to complete a normal workweek without interruptions from psychologically based symptoms suggest that the individual's psychological symptoms would frequently be severe. But once Plaintiff was removed from her last customer service job, her symptoms were only moderate to mild, even though she was under a great deal of financial stress. And further, there is no evidence supporting Plaintiff's allegation of a severe memory or concentration problem that would interrupt work or require special supervision.

In March 2011, Dr. Most and Mr. Bennett assessed Plaintiff with GAF scores of 45 and 50, respectively. (Tr. 809, 816.) However, the day before Dr. Most assessed Plaintiff with a GAF score of 45, Plaintiff was only very mildly depressed. (Tr. 826.) Also, Dr. Most found that Plaintiff's mood was primarily stable with the exception of "brief" mood swings that were more related to her

personality disorder than to bipolar disorder. (*Id.*) And, when Plaintiff was disappointed about receiving an unfavorable decision on her social security disability claim in April 2011, Plaintiff admitted to Mr. Bennett that her depression was not severe and was related to her disability claim. (Tr. 912.)

In fact, much of the narrative in Plaintiff's treatment records relate to the stress and depression caused by financial woes and the long wait for workers compensation and social security disability decisions. (*See, e.g.*, Tr. 383, 416, 386, 690, 617, 907.) But despite these stressors, Plaintiff fluctuated from only mildly to moderately depressed. In fact, with respect to Plaintiff's depressed mood, in October 2009, Mr. Bennett stated, "[a]s always, the client has managed such mood with persistent activity: recently [s]he's been playing cards with her mother." (Tr. 703.) Accordingly, this Court concludes that the limitations the ALJ provided Plaintiff were appropriate.

Finally, the ALJ rejected the treating providers' opinions, in part because they were not aware of how Plaintiff presented outside the mental health treatment environment. (Tr. 22.) This Court does not construe this to mean the ALJ believed Plaintiff's psychiatrists and psychologist were somehow required to evaluate Plaintiff in her home or another setting. The ALJ's point was that Plaintiff did not appear to have any social limitations or other notable mental limitations outside her interactions with medical doctors and physical therapists. (*Id.*)

The ALJ carefully evaluated the treating provider's opinions and did not err in discounting these opinions because there was substantial evidence in the record supporting the ALJ's conclusion that Plaintiff was not entitled to benefits. And because there was other substantial evidence supporting the ALJ's evaluation of the treating providers' opinions, the ALJ did not err in discounting their opinions on this basis.

### B.     Development of the Record

Plaintiff also contends that it was improper for the ALJ to rely on a non-examining physician's opinion of the claimant's residual functional capacity, and that the ALJ should have contacted the treating physicians for clarification or ordered an examination of Plaintiff.  (Pl.'s Mem. 25–26.)  Plaintiff relies on *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000), where the Court held a non-examining physician's report did not satisfy the ALJ's duty to fully and fairly develop the record.  (Pl.'s Mem. 24–25.)  *Nevland* is distinguishable, however, because there, "not one of Nevland's doctors was asked to comment on his ability to function in the workplace."  *Nevland*, 204 F.3d at 858.  Here, Plaintiff's two psychiatrists and her psychologist provided their opinions on Plaintiff's ability to function in the workplace, and the ALJ considered those opinions.

Important to the analysis here is that although "[a] non-treating physician's assessment does not alone constitute substantial evidence if it conflicts with the assessment of a treating physician," *Lehnartz v. Barnhart*, 142 Fed. Appx. 939, 942 (8th Cir. 2005), an ALJ's RFC opinion may be based on a non-examining

physician's opinion *and* other medical evidence in the record. *See, e.g.*, *Stormo*, 377 F.3d at 807–08 (stating that an ALJ's RFC determination was supported by state agency physicians' opinions, claimant's daily activities, and mental health treatment records). In addition, an ALJ may discount treating physicians' opinions without seeking clarification or further development of the record when the ALJ discounted the opinions because they were inconsistent with other substantial evidence. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

It is clear from the ALJ's opinion that she reviewed and relied on the evidence as a whole, not solely on the non-examining physicians' opinions. Plaintiff suggests that the narratives in her treatment records support disability, but this Court finds that substantial evidence, including the narratives, indicates Plaintiff functioned fairly well despite a significant amount of financial stress. Further, Mr. Bennett believed Plaintiff would improve if she made the effort to engage in more activities, and the record does not indicate her symptoms were so severe as to prevent her from doing so. In June 2011, Mr. Bennett even suggested that having a job would help Plaintiff. Therefore, this Court concludes that substantial evidence in the record supports the ALJ's RFC finding and the ALJ's conclusion that there is other work that exists in significant numbers in the national economy that Plaintiff could perform.

# RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's motion for summary judgment (Doc. No. 11), be **DENIED**;

2.      Defendant's motion for summary judgment (Doc. No. 17), be

**GRANTED**; and

3.      This case be **DISMISSED WITH PREJUDICE**, and judgment be

entered accordingly.


Date: November 7, 2013            __*s/ Jeffrey J. Keyes*_____
                                  JEFFREY J. KEYES
                                  United States Magistrate Judge


Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and
Recommendation by filing with the Clerk of Court, and serving all parties by
**November 21, 2013**, a writing which specifically identifies those portions of this
Report to which objections are made and the basis of those objections.  Failure
to comply with this procedure may operate as a forfeiture of the objecting party's
right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within **fourteen days** after service thereof.  A judge shall
make a de novo review of those portions to which objection is made.  This Report
and Recommendation does not constitute on order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.